Harvey Wayne **DORTON**, Petitioner-Appellant,

v.

**UNITED STATES of America,**
**Respondent-Appellee.**

Larry Bert **PRICE**, Petitioner-Appellant,

v.

**UNITED STATES of America,**
**Respondent-Appellee.**

Jerald Paul **BROWN**, Petitioner-Appellant,

v.

**UNITED STATES of America,**
**Respondent-Appellee.**

Nos. 577-70—579-70.

United States Court of Appeals,
Tenth Circuit.

Aug. 13, 1971.

Loyd G. Pearcy, Englewood, Colo., for petitioners-appellants.

Richard V. Thomas, U. S. Atty. (Tosh Suyematsu, Asst. U. S. Atty., on the brief), for respondent-appellee.

Before PHILLIPS, SETH and Mc-WILLIAMS, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

Each of the above-named petitioners filed a motion under 28 U.S.C. § 2255 to vacate a sentence imposed on him in the United States District Court for the District of Wyoming on a plea of guilty to an information charging him with a violation of the Dyer Act, 18 U.S.C. § 2312, namely, the interstate transportation of a motor vehicle, knowing it to have been stolen.

From a denial of their respective motions, each petitioner has appealed. Their appeals were consolidated for a hearing in this court.

Each petitioner set up the following four grounds for his motion:

1. Denial of counsel;
2. Denial of leave to withdraw his plea of guilty;
3. Denial of his right of appeal;
4. That his court-appointed counsel failed to represent him to the best of his ability.

The sentences were imposed on a plea of guilty by each petitioner. Prior to the imposition of the sentences, each of the petitioners, on July 5 and July 9, 1968, had made an oral motion to withdraw his plea of guilty. Such motions were heard on July 9, 1968. At such hearing, petitioners were represented by Frederick G. Loomis, a member of the bar of the

Supreme Court of Wyoming and of the bar of the United States District Court for the District of Wyoming, who represented petitioners under the appointment of the court from prior to their arraignment until the sentences had been imposed. The motions to withdraw the pleas of guilty were denied.

The petitioners did not file written motions to withdraw their pleas of guilty.

Partly from informal oral motions made by their appointed counsel and partly from the testimony of each petitioner, liberally construed, we will undertake to state separately as to each petitioner the grounds upon which he based his motion to withdraw his plea of guilty.

The grounds urged by Brown were:

1. That when he was arrested by the City Police, he requested the presence of counsel to represent him before he made any statement and such request was denied;

2. That he made a statement to Robert C. Gustafson, Special Agent of the Federal Bureau of Investigation (hereinafter referred to as the F.B.I.), upon the promise by Gustafson that if Brown would tell him everything that Carol Cornelious would be released;

3. That Gustafson told Brown that if he was prosecuted for violation of the Dyer Act, the states would drop their charges against him.

The grounds urged by Price were:

1. That after he had been questioned by the City Police, but had not made any incriminating answers, he requested an attorney and his request was denied.

    (On his direct examination, Price stated that when he asked for an attorney, the questioning ceased, and that he had not said anything indicating he had committed a crime.)

2. Same as Brown's No. 2;

3. That Loomis, after discussing the matter with the court, promised Price that he would get a "lesser" sentence if he pleaded guilty to an offense as to which the evidence was clearly against him than he would if he pleaded not guilty and was tried and found guilty.

The grounds urged by Dorton were:

1. Same as Brown's No. 2;

2. Same as Brown's No. 3;

3. That after the police officers began questioning him he requested counsel and his request was denied. (Dorton was not further questioned by the police after he requested an attorney. He had made no incriminating statements when the questions ceased and were not renewed.)

4. Same as Price's No. 3.

The court allowed the petitioners and their counsel broad latitude in the presentation of their evidence to establish grounds for withdrawal of the pleas of guilty.

At the hearing on the § 2255 motions, petitioners introduced no evidence other than the transcript of the proceedings on July 5 and July 9, 1968, on the motions to withdraw the pleas of guilty and the evidence introduced at the hearing on July 9, 1968, and the United States introduced only the evidence of Frederick G. Loomis.

The trial court consolidated for hearing the respective motions filed by each petitioner for leave to withdraw his plea of guilty and enter a plea of not guilty. The trial court accorded each petitioner a full and fair evidentiary hearing on this motion.

Most of the material evidentiary facts appear from the transcript of the hearing on the motions to withdraw the pleas of guilty. The evidence at that hearing fully established the following facts:

On May 28, 1968, the petitioners escaped from the Utah State Penitentiary at Draper, Utah, where they were

incarcerated on convictions of the commission of crimes in Utah. They stole a pickup truck at Lehi, Utah, and traveled in it to Las Vegas, Nevada, where they abandoned it and stole a 1963 Corvair and traveled in it to Bend, Oregon, where they abandoned it and stole a 1963 two-door white Oldsmobile, in which they traveled to the Canyon Village Motel in Yellowstone Park, where Price and Brown stole the license plates from another automobile and placed them on the Oldsmobile. They picked up a female companion, Carol Cornelious, in the Park and the four of them traveled to Cheyenne, Wyoming, arriving there in the afternoon of June 9, 1968.

Simpson and Backus were detectives in the Cheyenne Police Department. On the evening of June 9, 1968, they were dispatched to the Hitching Post Inn Motel on the western edge of Cheyenne to investigate several persons who had used a Bankamericard credit card to rent two units in the motel. The person who presented the card had no driver's license or other identification to show that he was the person whose name appeared on the card. A telephone call was made by a representative of the motel to the central office of Bankamericard and it advised that the card would not be honored, unless the person presenting it had proper identification.

The clerk advised the officers that the four persons had arrived at the motel in an Oldsmobile, and gave the officers the license number thereon. The officers learned from Montana authorities that the license plate had been issued for a Dodge automobile. The officers then went to the rooms assigned to such four persons and found they had left the motel and apparently had taken all of their belongings. The officers then left the motel and shortly thereafter located the Oldsmobile at 16th and Central Avenue in Cheyenne. Brown was seated on the right side, Cornelious in the middle, and Price behind the wheel.

Backus had called Bankamericard at Los Angeles and was informed the card was issued to a Muriel Horner. Hence, the officers suspected the credit card had been stolen. Backus went to the driver's side of the Oldsmobile and asked Price for identification and for his draft card. Simpson went to the opposite side of the automobile and asked Brown for identification and for his draft card. They gave no identification and stated they did not have draft cards.

Backus then informed all three of them that they were under arrest for vagrancy. The standard Miranda warning used by the Cheyenne Police Department is set out in Note 1 hereto.[1]

Backus read the warning to Price and Cornelious and Simpson read it to Brown immediately after Backus informed them that they were under arrest. Brown and Price both stated that they understood the warning.

The officers transported Brown, Price and Cornelious to the Detective Bureau of the Cheyenne Police Department and placed them in separate rooms. In order to make out arrest sheets, the officers began to question Price and Brown, whereupon they asked for a lawyer and all questioning ceased.

After Brown, Price and Cornelious were arrested and taken into custody, a police officer found Dorton alone in the automobile and took him to the Police Station. He was placed under arrest for vagrancy and given the Miranda warning, set out in Note 1. After Dorton had answered some questions, he requested a lawyer, whereupon all questioning ceased.

---

1. The warning read:
"One. You have a right to remain silent.
"Two. Anything you say can and will be used against you in a court of law.
"Three. You have the right to talk to a lawyer and have him present while you are being questioned.
"Four. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish one."

Backus explained to the petitioners that the city could not appoint a lawyer for them. In his brief in the instant appeal, counsel for petitioners states: "However, upon their request for counsel, the Police terminated questioning and no inculpatory statements were obtained."

The motions of petitioners to withdraw their pleas of guilty and to enter pleas of not guilty came on for a hearing on July 9, 1968.

The court heard each petitioner's motion for leave to withdraw his plea of guilty separately.

The following additional facts were fully established at the hearing on the motions to withdraw the pleas of guilty.

On June 10, 1968, Brown, acting for himself, Price, and Dorton, called John Terrill, the United States Marshal for Wyoming, by telephone from the City Jail and told him that he and two other men were escapees from the Utah State Prison and that they wanted to see the United States Marshal about a stolen automobile. Terrill replied that it would not do much good for him to see them and that he would send an F.B.I. Agent to see Brown.

Terrill contacted Robert C. Gustafson, a Special Agent of the F.B.I., who was at the City Jail, and advised him of his conversation with Brown. Gustafson then contacted Brown and interviewed him at the Interview Room of the City Jail.

Gustafson first told Brown his name, told him he was a Special Agent of the F.B.I., showed him his credentials, and told him he was there to interview him with respect to a possible violation of the Dyer Act, the interstate transportation of a stolen automobile, which Brown was reported to have had in his possession when arrested in Cheyenne by the City Police. Gustafson then asked Brown if his name was Paul Butcher and Brown said it was not, that his name was Jerald Paul Brown. Brown then started to say something, but Gustafson interrupted him and told him not to say anything, because he wanted to advise him of his rights. Gustafson then produced a form used by the F.B.I., entitled "Interrogation: Advice of Rights," which is set out in Note 2 hereto.[2]

Gustafson then handed Brown a copy of the form and asked him to read it along with him. Gustafson then read each sentence to Brown separately and following the reading of each sentence, asked Brown if he understood it. To all such inquiries Brown answered, "Yes." Brown then signed the Waiver of Rights, which is set out in Note 2, and Gustafson witnessed it with his signature and filled in the time at 10:20 a. m. He asked Brown what he wanted

---

2. The form used by the F.B.I. reads as follows:

"INTERROGATION; ADVICE OF RIGHTS

"YOUR RIGHTS

    "Place ————
    "Date ————
    "Time ————

"Before we ask you any questions, you must understand your rights.

"You have the right to remain silent.

"Anything you say can be used against you in court.

"You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

"If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

"If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

"WAIVER OF RIGHTS

"I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

    "Signed ————

"Witness ————
"Witness ————
"Time ————"

to say before he was interrupted by him to advise him of his rights. Brown said that he and the other two defendants wanted to tell about their activities, the things they had done, and they wanted to go federal rather than state, but that they wanted to be sure that Carol Sue Cornelious would not be prosecuted, because she was not involved in any of the matters. Gustafson then advised Brown that the F.B.I. was the investigative branch of the Department of Justice and could not say whether or not Carol Cornelious or anyone else would be prosecuted, because that was a matter for the United States Attorney and he was the one who decided whether or not anyone would be prosecuted in a federal court. He further advised Brown that the F.B.I. makes the investigation and furnishes the information to the United States Attorney, and it is upon those facts that the United States Attorney bases his opinion of whether or not to prosecute. He further advised Brown that to his knowledge there was no federal warrant for their arrest, and that he and the other two male defendants and Cornelious were in custody of the Cheyenne Police Department, and that he, Gustafson, had nothing to do with that matter nor any prosecution that the Police Department might undertake. Brown then asked Gustafson if he knew what the Utah authorities would do if they would prosecute them. Gustafson told him that he did not know what the Utah authorities might do. Brown then said they were wanted in Utah, Nevada, and Oregon for car theft and asked Gustafson what would happen about them. Gustafson advised him that if a federal violation was involved, the F.B.I. would investigate and furnish the information to the appropriate United States Attorney to see whether or not he wanted to prosecute them. He told Brown that the F.B.I. did not make the determination as to whether they would be prosecuted. Brown then replied that he would like to return to his cell and discuss the matter with the other two defendants. Gustafson said that

would be all right with him and that "I want you to go."

Brown remained with the other defendants about five minutes and then returned to the Interview Room. Gustafson asked him whether he had discussed the matter with the other defendants. Brown said "Yes" and that they had agreed to tell the F.B.I. everything. Brown then went on and told Gustafson the complete story. Gustafson then asked Brown if he desired to furnish a written statement. Brown said "Yes." Gustafson asked him if he desired to write it. Brown said "No" and asked Gustafson to write it. Gustafson then prepared the written statement, which appears in the Appendix to this opinion.

The last three lines of Brown's written statement, given to Gustafson, were written by him in his own handwriting and read: "I have read this three page statement and it is true to the best of my knowledge."

At a hearing on the motions to withdraw the pleas of guilty, Brown testified that he told Gustafson that they were being held on a city charge of vagrancy and asked him if "they would make a statement, could he get Carol Cornelious turned loose for us"; that "Gustafson told us that he was federal and didn't have nothing to do with the city, but he would see what he could do." Brown was asked by his counsel if Gustafson agreed that if Brown would tell him everything he would obtain Carol Cornelious's release. Brown replied "Well, he didn't come right out and say it, but in so many words, and then I imagine it was him that got her turned loose. I know she was turned loose with never appearing in court." He was then asked to state what "in so many words" meant, and what Gustafson said. Brown replied, "Well, he told us that he was the Federal officer and had no connection with the state, but that he would do what he could. He said he thought he could arrange it."

He further testified that he asked Gustafson, if he told him everything,

what he would do about state charges against the three petitioners, and that Gustafson said that "the State would drop their charges and just let us go Federal, because we had so many other charges on us in Utah"; that he told Gustafson that he did not want to do time in the state; that Gustafson told him if they went federal the state would drop the charges against him, and that he was mostly concerned, however, in getting Cornelious turned loose.

In his testimony Gustafson said he had never made any such promises or statements or anything like them to Brown.

The court denied the motion of Brown to withdraw his plea of guilty and sentenced him to the custody of the Attorney General, to be confined in an institution designated by him for a period of four years.

The court then asked Price to step forward. Loomis then made an oral motion for permission for Price to withdraw his plea of guilty and to enter a plea of not guilty.

Gustafson testified with respect to the interview with Price. He outlined the procedure he followed, and it was substantially the same as he followed in his interview with Brown. He further testified that Price signed the Waiver of Rights and stated he did not want a lawyer and that he knew what he was doing.

After Gustafson had questioned Price orally and Price had answered his questions, Gustafson asked him if he would make a written statement. Price answered, "Yes" and requested Gustafson to write it out. The written statement was in all respects substantially the same as Brown's, which appears in the Appendix to this opinion. However, Price added in his own handwriting, as Brown had done, the last three lines of the statement, which read, "I have read this three page statement and it is true to the best of my knowledge." Price initialed the first two pages of the statement and signed it at the bottom of the third page.

Price testified that before he made his statement to Gustafson, he told Gustafson his reason for making it was to get Cornelious turned loose; that Gustafson replied, "I cannot promise you, but I will try," and that Gustafson further said that if they were prosecuted by the federal officers, the City would probably drop the burglary charges against them.

In his testimony, Gustafson said he had never made any such promises or statements, or anything like them to Price.

Price set up as the third ground of his motion to withdraw his plea of guilty that Loomis, after discussing the matter with the court, promised Price that he would get a lesser sentence if he pleaded guilty to an offense as to which the evidence was clearly against him than he would if he pleaded not guilty and was tried and found guilty.

At the hearings on the motions to withdraw the pleas of guilty, none of the testimony given by Price in any way supported the third ground of his motion. In fact, in his direct testimony he gave no evidence with respect to that ground.

On cross-examination, however, it developed that Cornelious was released on June 10, 1968, two days before he entered his plea of guilty. He was then asked on cross-examination:

"Q. So your incarceration had nothing to do with the fact that you entered a plea of guilty, did it?

"A. Perhaps not. Our plea of guilty was entered because we was told that we would get a lesser sentence if we plead guilty."

However, he did not anywhere in his testimony attribute such statement to Loomis.

The court denied Price's motion to withdraw his plea of guilty and asked him to step forward. He then sentenced Price to the custody of the Attorney General, to be confined in an institution designated by him for a period of four years, six months.

The court then proceeded with the hearing on Dorton's motion to withdraw his plea of guilty.

Gustafson testified that he interviewed Dorton on the afternoon of June 10, 1968, in the Interview Room of the City Jail. Gustafson told Dorton his name, showed him his credentials, and told him he was there to interview him concerning a 1963 Oldsmobile, which had been reported stolen at Bend, Oregon.

Gustafson asked Dorton if his name was Muriel Edward Horner. Dorton replied that it was not, that his name was Harvey Wayne Dorton.

Gustafson, using the written form, then advised Dorton of his rights, following the same procedure as he had with Brown and Price. Dorton then signed the Waiver of Rights. Gustafson orally asked Dorton if he wanted an attorney and Dorton replied, "No." Gustafson further asked Dorton if he wanted to contact an attorney and Dorton answered, "No." Then Gustafson asked Dorton if he was willing to tell him what happened, and Dorton said he was. Dorton then stated all of the facts set forth in the statements of Brown and Price and the following additional facts:

He was confined in the Utah State Penitentiary for cashing an insufficient funds check, for from zero to five years; that they played the slot machines in Las Vegas and increased their cash to $100; that they drove to San Francisco, where they purchased a purse for $100 which had identification papers in the name of Muriel E. Horner and a Bankamericard in that name; that they used the Bankamericard to pay motel charges and also to buy Cornelious some clothes; that the purse contained some blank checks with the name Muriel Horner printed thereon, and that he cashed one of them for $30 at the Olympic Hotel in San Francisco; that in Idaho Falls, Idaho, they used the credit card to purchase Cornelious a dress and some slacks; that they tried to get keys for another car in Cheyenne and failed; that they also tried to wire around the ignition on a Ford Mercury, but were unable to get it started.

Gustafson then asked Dorton if he desired to make a written statement and Dorton said, "No."

Dorton testified that he told Gustafson the main reason they were making the statements was because Cornelious was innocent and Gustafson said he would do everything he could to secure her release; that he was not certain, but he believed that Gustafson said he knew the State District Attorney and if they were prosecuted in the federal court, Wyoming would not prosecute them.

Gustafson denied making any such statements to Dorton with respect to getting Cornelious released; denied that Dorton told him he was making the statement chiefly for the purpose of getting Cornelious free from custody, and denied that he made any statement with respect to the prosecution of the prisoners by Wyoming.

On redirect examination, in answer to the question of Loomis, "Before you made your statement, did Mr. Gustafson make any promises to you that if you would make a statement that he would do something for you?" Dorton answered, "No."

At the beginning of the hearing on Dorton's motion to withdraw his plea of guilty, Loomis dictated an oral motion which included the same ground that Price set up in No. 3. After dictating that ground, Loomis made this statement:

"As to my own promise, I told him that the probability was that he would get a lesser sentence, and there was no promise. I told him that was up to the Court and that I could do nothing about it."

Thereafter, there was a private discussion between Dorton and Loomis, following which Loomis made this statement:

"He says also that after discussing the matter with them, their problem, that I came and talked to the court about it. Then I told them that they would get a lesser sentence and it would probably be consecutive, but less than the maximum."

The Court then made this statement:

"But I made no promise of any kind."

Mr. Loomis then said:

"They were promised nothing."

The court then said:

"Let the record show that the Court has made no promise of any kind with respect to any one of these three Defendants or to anyone."

Thus it will be seen that the only thing in the record in anywise supporting the second ground set up by Dorton was the recitation by Mr. Loomis of what Dorton said to him. Dorton, himself, did not personally testify that any such promise was made.

The court knew Frederick G. Loomis very well and knew that he was a lawyer of fine ability and a man of integrity, and that he adhered to high standards of professional ethics. The court also knew he had not made any promises to Loomis about the sentences he would impose on Price and Dorton if they pleaded guilty, and that Mr. Loomis would not lie to the petitioners by telling them that the court had promised him that they would receive lesser sentences if they pleaded guilty.

We conclude that the court was fully justified in finding that the third ground set up by Price and the second ground set up by Dorton were not supported by the evidence.

The court sentenced Dorton to the custody of the Attorney General, to be confined in an institution designated by him for a period of three years.

Both Brown and Price, in their testimony at the hearing on their motions to withdraw their pleas of guilty and enter pleas of not guilty, expressly admitted that what was set forth in the statements which each read and signed after they had been written out by Gustafson was true. In other words, that Brown, Price and Dorton stole three automobiles and transported them in interstate commerce and were therefore guilty of the offense charged against them in the indictment.[3]

---

3. At the hearing on his motion to withdraw his plea of guilty, Brown testified as follows:

"Q. And after that Mr. Gustafson asked you some questions and took what you said down and wrote the written statement, is that true?

"A. Yes, sir.

"Q. And after he wrote that statement did you write the language at the bottom of page 3 that says, 'I have read this three page statement and it is true to the best of my knowledge,' is that your writing?

"A. Yes, sir.

"Q. And then your signature follows that, is that correct?

"A. Yes, sir.

"Q. Well, now, that is a true statement that you read that statement?

"A. Yes.

"Q. You read it before you signed it, didn't you?

"A. Yes.

"Q. And is it also a true statement that what the contents are in this statement are true and correct?

"A. Yes, sir.

"Q. So then when you made this statement to Mr. Gustafson all you were doing was telling him the truth, is this right?

"A. Yes."

At the hearing on his motion to withdraw his plea of guilty, Price testified as follows:

"Q. Now, at the time that you and Mr. Gustafson were talking, he filled out the handwritten portion of the statement, that is correct, too, didn't he?

"A. Yes.

"Q. But prior to the time you signed it isn't it true that you filled out the bottom of the page there where it says, 'I have read this three page statement and it is true to the best of my knowledge.'?

"A. Yes, sir.

"Q. That is your writing, isn't it?

"A. Yes, sir, it is.

"Q. And then you signed it 'Larry B. Price'?

"A. Yes, sir.

"Q. Well, what you said in the statement is true, isn't it?

"A. Yes, but there are circumstances."

Dorton, after he had heard read and had himself read, a sentence at a time, the written Advice of Rights and told Gustafson he understood each sentence, signed the written Waiver of Rights and orally stated to Gustafson that he, together with Brown and Price, had stolen three motor vehicles and had transported them in interstate commerce.

In other words, all three of the petitioners admitted at the hearing on the motions to withdraw their pleas of guilty that the Dyer Act charge in the information filed against them was true, and that each of them had committed the offense charged therein.

At the end of a full and fair evidentiary hearing accorded each petitioner on his motion to withdraw his plea of guilty, at which he was competently represented by court-appointed counsel, the court announced he found the plea of guilty entered by each petitioner was voluntarily and intelligently made, after full opportunity to consult with and after consulting with his court-appointed counsel.

We now turn to the motion of each of the petitioners to vacate his sentence.

At the request of the petitioners, the court granted them leave to proceed in forma pauperis on their § 2255 motions and appointed Allan B. Johnson, a member of the bar of the Supreme Court of Wyoming and of the bar of the United States District Court for the District of Wyoming, as counsel to represent them in the § 2255 hearing.

The court consolidated the motions for hearing.

The hearing was held on August 28, 1970. The petitioners introduced the arraignment proceedings and a transcript of the proceedings and the evidence introduced at the hearing on the motions to withdraw the pleas of guilty. They introduced no oral evidence.

The United States was represented at the hearing by Richard Van Thomas, the United States Attorney for the District of Wyoming. He introduced the testimony of only one witness, Frederick G. Loomis.

Loomis testified at the hearing on the § 2255 motions that he was appointed by the court to defend the petitioners on Dyer Act charges on June 12, 1968; that he interviewed them from 9:15 a. m. to 9:58 a. m. on that day; that he told them they should not plead guilty unless they were in fact guilty; that even if they were guilty, they had the right to plead not guilty and make the Government prove its charge against them; that if they were clearly guilty and the Government could clearly prove their guilt, it had been his experience that a lesser sentence would be imposed on them if they pleaded guilty, rather than not guilty, and compelled the Government to prove its charge against them; that he further told them they had the absolute privilege to plead guilty or not guilty, and what they did in that regard was for them to decide; and he expressly told them that sentencing was solely a prerogative of the judge and no one could tell in advance what the judge would do.

All of such statements were made by Loomis to the petitioners after the three of them had intelligently and voluntarily confessed their guilt on the Dyer Act charge in the information.

Loomis further testified, at the hearing on the § 2255 motions, that he was a lawyer by profession; that he graduated from Harvard Law School in 1951, took the bar examination and was admitted to the Wyoming bar; that from 1951 to December 1954 he was a general line officer in the United States Navy, and that he spent about one-half of his time in defending Naval personnel on charges brought against them in special court martials; that he would estimate he defended between 30 and 40 cases; that in 1954 he returned to private practice; that he had from time to time since then represented persons charged with crime under appointment by the court, and that he had probably represented between 20 and 35 such persons.

Mr. Loomis further testified, at the hearing on the § 2255 motions, that he had consulted with each of the petitioners on four different occasions and

represented them at all proceedings from the time of his appointment until the sentences had been imposed.

Loomis further testified at the § 2255 hearing that he made no promises to the petitioners of any kind to induce them to plead guilty; that each of the petitioners testified at the hearing on his motion to withdraw his plea of guilty at his own request; that none of them at any time told him that he was induced to make his confession because he was denied an attorney, and that they told him that they had told Mr. Gustafson everything.

He further testified that later he examined the Government's file, the F.B.I. file, and the probation officer's reports; that he interviewed the petitioners on June 12, June 14, and July 5, 1968; that on the latter date they told him they wanted to withdraw their pleas of guilty and plead not guilty; that he represented them at the hearing on the motions to withdraw their pleas of guilty on July 5 and July 9, 1968, and when they were sentenced. He further testified that the petitioners told him they were guilty of the Dyer Act charge and many other crimes and had a bad criminal record, and that the probation officer's reports which he examined before they were sentenced showed that their criminal records were even worse than they had told him. He said for those reasons there was not much he could say in the way of mitigating circumstances at the sentencing proceedings.

The first ground set up by petitioners as a basis for their § 2255 motions was the denial of counsel.

█ With respect to the denial of counsel by the City Police, it is sufficient to say that it resulted in no prejudice to any of the petitioners, as we have heretofore shown, and which their counsel in his brief on this appeal admits.

With respect to the denials of the requests of Brown and Dorton that the court appoint a new lawyer for each of them, we will deal with such denials later in this opinion.

The second ground upon which petitioners based their § 2255 motions was the denial of their motions to withdraw their plea of guilty.

█ A defendant who enters a plea of guilty has no absolute right to withdraw such plea, and it rests within the sound discretion of the court to determine whether, under the pertinent facts and circumstances, the defendant should be permitted to withdraw the plea of guilty.[4]

█ There is no absolute right to withdraw a plea of guilty, even before the imposition of sentence, and whether such a withdrawal shall be permitted rests within the sound discretion of the court.[5] But an application to withdraw a plea of guilty, made before imposition of sentence, will be considered carefully and with more liberality in favor of the accused than when such an application comes after the imposition of sentence.[6]

---

4. Burnett v. United States, 10 Cir., 404 F.2d 29;
   United States v. Stayton, 3 Cir., 408 F. 2d 559, 561;
   Miles v. United States, 10 Cir., 385 F. 2d 541, 543;
   Kienlen v. United States, 10 Cir., 379 F.2d 20, 24;
   Callaway v. United States, 10 Cir., 367 F.2d 140, 142;
   Vasquez v. United States, 9 Cir., 279 F. 2d 34, 37.

5. Kirshberger v. United States, 5 Cir., 392 F.2d 782, 787;

   Callaway v. United States, 10 Cir., 367 F.2d 140, 142;
   Everett v. United States, 119 U.S.App. D.C. 60, 336 F.2d 979, 983.

6. Kirshberger v. United States, 5 Cir., 392 F.2d 782, 784;
   Burnett v. United States, 10 Cir., 404 F. 2d 29;
   United States v. Stayton, 3 Cir., 408 F. 2d 559, 560;
   United States v. Giuliano, 2 Cir., 348 F. 2d 217, 221;
   United States v. Young, 3 Cir., 424 F. 2d 1276, 1279.

"This does not mean that every motion for withdrawal before sentence should be granted. There is no absolute right to withdraw a plea, and the right to do so is within the sound discretion of the trial court." [7]

■ The test to be applied where the motion to withdraw is made before imposition of sentence is fairness and justice. [8]

Assuming that the trial court followed the principles of law we have just set out, and we must so assume, because there is nothing in the record to indicate the contrary, then Ground No. 2 of the motions presented only issues of fact.

Because the trial court had an opportunity to see the witnesses when they testified and observe their demeanor on the witness stand, and was in a superior position to judge their credibility and the weight to be given their testimony, his findings should be accorded great weight and should not be set aside, if supported by substantial evidence.

As we shall undertake to show, the evidence afforded abundant support for the trial court's findings.

In reaching our conclusion in this appeal, we also have undertaken to follow the applicable principles laid down in the notes cited to the above text.

It was clearly established by the evidence and not denied by petitioners that Brown, acting for himself and the other two petitioners, called the United States Marshal and told him that he and two other men were escapees from a Utah prison, were in the City Jail, and wanted to talk to him about a stolen automobile; that the Marshal told Brown there was nothing much he could do, but he would send an F.B.I. Agent to see them. As a result, they were interviewed by Gustafson. Hence, their action initiated such interviews.

One of the grounds upon which each petitioner based his motion for leave to withdraw his plea of guilty was the statements and promises which he alleged had been made to him by Gustafson. Gustafson specifically and unequivocally denied he made any such statements or promises to any of the petitioners. On the other hand, each petitioner was equivocal and uncertain when he testified with respect to such statements and promises. [9]

Moreover, the testimony of Gustafson that he made none of the promises or statements testified to by one or more of the petitioners is strongly corroborated by the three lines which Brown and Price each added in his own handwriting to his written statement, and also by the

7. United States v. Stayton, 3 Cir., 408 F.2d 559, 561;
Meaton v. United States, 5 Cir., 328 F.2d 379, 380, cert. denied, 380 U.S. 916, 85 S.Ct. 902, 13 L.Ed.2d 801;
Everett v. United States, 119 U.S.App. D.C. 60, 336 F.2d 979, 983;
United States v. Young, 3 Cir., 424 F. 2d 1276, 1279.

8. Kercheval v. United States, 274 U.S. 220, 224, 47 S.Ct. 582, 71 L.Ed. 1009;
United States v. Young, 3 Cir., 424 F.2d 1276, 1279.

9. For example, Brown was asked:
"Q. Did Mr. Gustafson agree * * * that if you told everything he would obtain Carol Cornelious' release?
"A. Well, he didn't come right out and say it, but in so many words, and then I imagine it was him that got her turned loose."

On the same subject, Price testified:
"Now, I am not sure of this, but I think this is the way it went."
On the same subject, Dorton was asked:
"Q. * * * Now, when did you tell Mr. Gustafson that the reason you were giving this statement for the purpose of getting Carol Cornelious off? Was it before you made the statement, during the statement or after?
"A. After. After the statement was taken. During the conversation I asked —or right after he asked me—I can't remember if it was—it is sort of vague, really. I can't remember."
Dorton further testified:
"There was something about the State charges, that I believe he went and saw the District Attorney for this district and did talk to him, and Wyoming didn't want to prosecute if the Federals would prosecute. I believe this is what he told me, but I am not for certain."

recitals in the printed Waiver of Rights, which Brown, Price, and Dorton admitted they signed before they gave any statement to Gustafson, and which read:

"I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

■ We conclude that the evidence at the hearing on the motions to withdraw the pleas of guilty fully and clearly established beyond any doubt that Gustafson made no promise of any kind to any of the petitioners and that he did not in any way do or say anything to induce them to make the statements which they made to him, and that Gustafson interviewed the petitioners because of the request made by Brown in his own behalf and in behalf of the other two petitioners to the United States Marshal. In other words, the petitioners initiated what eventually and finally resulted in full and voluntary confessions of guilt by each of the petitioners.

We have no doubt that what Loomis testified he said to the petitioners when he conferred with them on June 12, 1968, with respect to pleas of not guilty and pleas of guilty was entirely true and was sound advice; and that Price and Dorton distorted it by claiming, as a ground for their motions to withdraw their pleas of guilty, that Loomis, after talking to the court, promised petitioners that they would get a lesser sentence if they pleaded guilty.

The third ground for the § 2255 motions was the denial of the right to an appeal.

When the court inquired of Brown if he had anything to say as to why sentence and judgment of the court should not be pronounced upon him, Brown said:

"Yes, sir. I would like to have another attorney appointed to me, and I am going to carry this a little further. I will be sent back to Utah, but I would like an attorney appointed here to handle my case."

The court denied the request, saying:

"I have appointed you a Harvard graduate, one of the top lawyers in Cheyenne to represent you, and I want the record to so show. I want the record to show that the United States Attorney has made a full disclosure to your counsel of the entire file in this case, and I have made available to counsel the report of the probation officer."

When the court inquired of Dorton if he had anything to say as to why sentence and judgment of the court should not be pronounced upon him, Dorton replied:

"Your Honor, on the matter of your decision for my withdrawal of plea, I would like to appeal this. Since I am not very familiar with the mechanics of the technicalities of doing so, I would appreciate it if you would appoint another court-appointed lawyer."

The court then inquired, "Are you dissatisfied with the one you have?"

Dorton replied:

"No. I was under the understanding that due to the fact that he was one of the witnesses that he could not also defend, or enter this motion or writ or appeal or whatever it be." [10] The court then stated:

"Well, whether a Court permits or denies the withdrawal of a plea of guilty is left entirely to the discretion of the trial court, and I have exercised that discretion and there is no appeal from it."

Of course, the statement by the trial court that there was no appeal from the order denying leave to withdraw

10. Loomis was not a witness at the hearing on the motions to withdraw the pleas of guilty.

the pleas of guilty was literally correct. However, it may have misled Dorton. While he could not appeal from the order denying his motion to withdraw his plea, he could have appealed from the judgment of conviction and sentence and set up that the denial of the motion to permit him to withdraw his plea of guilty was an abuse of discretion and therefore error. We think the court should have explained that to him when he made the statement that there was no appeal from his order denying the motion to withdraw the plea of guilty.

For that reason, we have set out all of the pertinent portions of the proceedings on the motions to withdraw the pleas of guilty and all of the pertinent facts shown by the evidence with respect thereto. Our purpose in so doing is to show, as we believe such record and evidence clearly show, that an appeal from the orders denying the motions to withdraw the pleas of guilty would have been wholly unavailing to the petitioners, because the record clearly shows that each of them voluntarily and intelligently entered a plea of guilty, and that the court did not abuse his discretion in denying the motions to withdraw such pleas.

■ It is our conclusion that, after a full and fair hearing, it clearly appeared that the motions to withdraw were groundless and were properly denied by the court in the exercise of a sound discretion, and that had an appeal been taken from the judgment and sentences and the denial of the motions to withdraw the pleas set up as error, the result would have been an affirmance.

Hence, we conclude that the court's statement with respect to an appeal resulted in no prejudice or injury to the petitioners, or to any one of them.

The fourth ground for the § 2255 motions was that Loomis failed to represent to the best of his ability each of the petitioners.

In serving the petitioners as their counsel, Loomis was confronted with a very difficult situation. At the time he was appointed on June 12, 1968, to act as their counsel, each petitioner, at a time when he said he did not want a lawyer, had voluntarily and intelligently confessed his guilt to Gustafson, an F.B.I. Agent. The trial judge, who had been an able and experienced lawyer before his judicial appointment, and was in a good position to judge the quality of Loomis's representation of petitioners, found that the petitioners' claim, set up in Ground No. 4 of their § 2255 motions, was not well founded. The evidence showed that Loomis was well qualified by training and experience to represent petitioners.

■ We are of the opinion that the evidence and record of the proceedings show without any doubt that Loomis intelligently and competently represented each of the petitioners from June 12, 1968, until the imposition of sentences. Apparently, he did not discuss with petitioners an appeal from the denial of the motions to withdraw the pleas of guilty, for the very sound reason that such an appeal would have been of no avail to the petitioners.

The court made extensive Findings of Fact. Findings of Fact 1, 2, 3, 4, 5, 6, 7, 8, and 9 are set out in Note 11 hereto.[11]

For the reasons above set out, we conclude the motions to vacate the judg-

11. "FINDINGS OF FACT
"1. That on July 9, 1968, a hearing was held by the Court upon the oral motions of the respective petitioners to withdraw their respective pleas of guilty in UNITED STATES OF AMERICA, Plaintiff v. JERALD PAUL BROWN, LARRY BERT PRICE and HARVEY WAYNE DORTON, Defendants, No. 8011 Criminal, United States District Court for the District of Wyoming, which had been entered on June 12, 1968, and at that time testimony was taken from Mr. Robert C. Gustafson, Special Agent, Federal Bureau of Investigation, Mr. David Simpson, Detective, Cheyenne Po-

ment and sentence of each petitioner are wholly without merit and the judgments denying such motions are therefore, affirmed.

### APPENDIX

The statement of Jerald Paul Brown reads as follows:

"I, Jerald Paul Brown, make this free and voluntary statement to Robert C. Gustafson, Special Agent, Federal Bureau of Investigation. I was born 11–27–42 at Lehigh, Utah.

"On May 27, 1968, I escaped from the Utah State Prison, Draper, Utah, with Larry Price and Harvey Dorton. We went to the mountains and hid out until the next night when we stole a Chevrolet Pickup truck, yellow in color, from in front of a residence outside of Draper, Utah. The keys were in the truck. We took turns driving the truck to Las Vegas, Nevada, where we arrived the following morning. We stayed in Las Vegas until about midnight. We left the Chevrolet Pick-

lice Department, John Terrill, United States Marshal for the District of Wyoming, and the respective petitioners relating to the oral motions to withdraw the pleas of guilty.

"2. That the transcripts of the defendants' arraignment and the testimony received at the hearing on July 9, 1968, disclosed that the respective pleas of guilty of petitioners were intelligently and voluntarily made, were supported factually by independent evidence and by the complete and voluntary confessions and statements to the crime charged on the part of each of the petitioners, which confessions were furnished to Mr. Robert C. Gustafson, Special Agent of the Federal Bureau of Investigation, after each of the petitioners had been fully informed of his Constitutional rights and had waived the appointment of and presence of counsel with respect to the interrogation by Mr. Gustafson.

"3. That on July 9, 1968, this Court, in the exercise of its discretion, refused to grant the oral motions of the petitioners to withdraw their pleas of 'guilty' in the aforesaid criminal case.

"4. That the transcript of the hearing of July 9, 1968, discloses that upon their arrest by officers of the Cheyenne, Wyoming, Police Department each of the petitioners was informed of his right to counsel in accordance with the requirements of the Constitution of the United States of America, and the transcript further discloses that at the time of booking each of the petitioners asked for counsel, and on occasion was informed that because the charge upon which he was held by the City of Cheyenne constituted a petty offense, the Police Court of the City of Cheyenne would not appoint counsel to represent him, although he was

afforded an opportunity to contact his own attorney.

"5. That the transcript further discloses, especially by the admissions of the respective petitioners, that no information was given or statements made to the officers of the Cheyenne Police Department which would incriminate any of the petitioners in any violation of any crime.

"6. That the transcript further discloses the petitioners requested an interview with federal authorities, and Special Agent Robert C. Gustafson of the Federal Bureau of Investigation met with each of them. Special Agent Gustafson advised each of the petitioners of his Constitutional rights, and after receiving such advice, each of the petitioners waived the right to have counsel present at the interview and each proceeded to and did make a complete confession to Special Agent Robert C. Gustafson of the offense charged in this court.

"7. That none of the petitioners was denied counsel at any material stage of the proceedings against him and none of them was in any fashion prejudiced by the action of the Police officers of the Cheyenne, Wyoming, Police Department in this instance.

"8. That the petitioner HARVEY WAYNE DORTON was the only one of the petitioners who in any manner discussed appeal with his Court on July 9, 1968, and the transcript does not support the contention that Dorton nor any of the petitioners was denied his right of appeal.

"9. That each of the petitioners was ably and effectively represented by appointed counsel at all stages of the proceedings in this court."

up truck on the street in a residential area and stole a blue 1963 Chevrolet Corvair, two-door. The keys were in the Corvair and it had unknown Nevada license plates.

"We took turns driving the Corvair and drove to Bend, Oregon where we left it on the street in a residential area. I believe it was on June 5, 1968 we stole a 1963 Olds. two-door, white in color. We stole the Oldsmobile from a used car lot. Earlier in the day we had been to the used car lot and looked at the Oldsmobile and took a key off of the key ring. We later found out we had taken the trunk key, so we had to wire the ignition to get it started. Harvey wired the car. We then drove to Yellowstone National Park, Wyo. where we stayed at the Canyon Village Motel. Harvey registered us under the name of Muriel Horner.

(It will be remembered that was the name on the credit card which was used at the motel in Cheyenne.) because that was the name for which we had identification for. Larry Price and I stole a set of Montana license plates from a car across the street from the Canyon Village and after leaving Yellowstone National Park we put these plates on the car and threw the Oregon plates away. We then came to Cheyenne, Wyo. where we arrived during the afternoon of June 9, 1968.

"Larry Price, Carol Cornelious and I were in the 1963 Olds. when arrested at Cheyenne, Wyo. I want to say that Carol Cornelious did not know we were escapees or that the car we had was stolen and she does not know our real names.

"I have read this three page statement and it is true to the best of my knowledge.

"/s/ Jerald Paul Brown

"Witness: /s/ Robert C. Gustafson
Special Agent, F.B.I.
Cheyenne, Wyo."